DANIELS *v.* STATE.

Opinion delivered June 17, 1905.

1. MURDER—SUFFICIENCY OF INDICTMENT.—An indictment for murder which uses the word *willingly* in lieu of "willfully" is not defective where it charges that the defendant "unlawfully, feloniously and of his malice aforethought and after deliberation and premeditation did kill and murder," etc., as these words include all the meaning which could be conveyed by the word "willfully." (Page 84.)

2. JUROR—CHALLENGE—PRESUMPTION.—Where the record shows that the State was permitted to challenge a juror peremptorily after he had been accepted by both sides, it will be presumed, in the absence of a contrary showing, that the challenge was allowed before the juror had been sworn in chief, as prescribed by Kirby's Digest, § 2357. (Page 85.)

Appeal from Sevier Circuit Court.

JAMES S. STEEL, Judge.

Affirmed.

*Brizzolara & Fitzhugh, W. H. Collins* and *Pole McPhetrige,* for appellant.

*Robert L. Rogers,* for appellee.

WOOD, J. At the September, 1904, term of the Polk Circuit Court the grand jury returned an indictment against appellant, charging him with murder in the first degree, and, having been granted a change of venue to the Sevier Circuit Court, he was, at the January term thereof, tried upon the plea of not guilty, convicted of murder in the second degree, and his punishment assessed at five years in the penitentiary. His motion for a new trial having been overruled, he appealed to this court, alleging numerous grounds for reversal of the judgment.

The indictment was sufficient. The word "willingly" in the indictment instead of "willfully," which latter word was doubtless intended, does not render the indictment insufficient. The utmost that can be claimed is that the word "willfully" was

omitted.   But the indictment, with the word "willfully" omitted, still charges that the defendant "unlawfully, feloniously and of his malice aforethought and after deliberation and premeditation did kill and murder," etc.   These words include all the meaning that could be conveyed by the word "willfully."

The record shows that "T. B. Holman, who was a juror and a member of the regular panel of the jury, during the impaneling of the jury in this action, was duly accepted as a juror herein by the State and the defendant, and the State was permitted by the court, over the objection and exception of the defendant, to excuse said T. B. Holman by peremptory challenge, without stating or showing any cause therefor, after the said Holman had been accepted by the State and the defendant as a juror as aforesaid."   This record does not show that the State was permitted to exercise this peremptory challenge "after the jury had been made up," as stated by counsel for appellant.   As every presumption, in the absence of a showing to the contrary, must be indulged in favor of the regularity of the proceedings, we must presume that the State exercised this peremptory challenge before the juror was sworn in chief, as prescribed by section 2357, Kirby's Digest.   These are the only grounds for a new trial which the verdict could not cure, and these are not well taken.   All the others relate to alleged errors of the court during the progress of the trial, which do not affect the integrity of the trial itself, and which, however egregious, the verdict of the jury upon the uncontradicted evidence has cured.

The undisputed facts show that appellant was guilty at least of murder in the second degree, and the jury gave him the lowest punishment for that offense.   Therefore, no error in the introduction of the evidence complained of, the argument of counsel, or the instructions of the court could be prejudicial to the rights of appellant.   His own evidence shows that he was an engineer on the Kansas City Southern Railroad, and on the night of August 18, 1904, he returned from a trip on the road to his home at Mena, Ark.   He arrived at his home about 1:25 a. m., and found the deceased, Dr. Magness, in his house, under circumstances which indicated clearly that he was committing adultery with his wife.   The appellant chased the doctor, who

was partially disrobed, from his house, failing, however, to catch him. The doctor left behind in the house of appellant a shirt, collar, cuff, necktie and hat, which afforded indisputable evidence of his identification. Besides, the unfaithful wife, when called upon by appellant for an explanation, frankly confessed to appellant that Dr. Magness was the author of her ruin, and told her husband that Dr. Magness had first accomplished his purpose by administering to her on one occasion a narcotic, when she had called him in on a professional visit. Dr. Magness was the family physician and intimate friend of appellant. The appellant proceeds to tell how the betrayal of confidence by his family physician and friend and the disclosure of his wife's infidelity so preyed upon his mind that he could neither eat nor sleep. He shows that during the remainder of the night of the awful discovery he could not sleep. In fact, he says he neither ate nor slept from the time he came home and caught the doctor in his house until he had killed him. He says his wife had told him that Dr. Magness had said that if he (appellant) ever came home and found him (Magness) in their house, he (Magness) would kill him (appellant). "Knowing," he says, "that he had just threatened my life, and finding this murderous thing (pistol) in my house, I saw nothing but to go prepared, as I firmly believed that man would kill me. That is the reason I took the pistol, and went to the hardware store, and bought the cartridges." He further portrays his feelings and subsequent conduct as follows:

"I could get no satisfaction from life, knowing that that man had robbed my home and taken from me everything that I had. I sought in some manner redress for the harm and disgrace that he brought upon me. I knew that he would kill me on sight. I looked for him on the street the next day, but failed to find him. I was on the streets most of the day, but I did not see him anywhere, and feel sure that he was hiding from me. That night I could not sleep, and the next morning I went down town, and as I passed the drug store I saw his horse and buggy hitched there in front, but did not see him. I went into the drug store, passed the last opening between the counters on the lefthand side. I went behind these counters in an upright

manner, as straight as I could walk, and as I got about half way between the counters, Dr. Magness came out from behind the prescription case. He had a bottle of medicine in his hand, and from his appearance he was reading the directions on the label. I started toward him, and when I got in about ten feet of him he saw me, and as he did so he went for his gun. Up to that time my right hand was by my side. When I saw him reach for his gun, I knew the time had arrived, and that one of us was going to die. I pulled my gun, and while he was looking at me I shot him in the lip. I shot him twice more, while he was standing upright, over the heart. At that he fell over on his back, and while he was falling he stumbled over a chair, which turned his right side toward me while he was falling, and I shot him twice more. That man's back was never to me at any moment of the shooting. I did not make any step toward him, nor did I shoot him while on the floor. I shot him to protect my life. He had ruined my home, and had threatened to kill me, and I believed that he would do it."

This testimony reveals the settled purpose of appellant, from the time he found Dr. Magness in his home, to seek and take his life. About two days intervened, the appellant not wavering one moment in his determination. All the eyewitnesses save appellant show that appellant shot the deceased in the back, and when he was apparently unaware of appellant's presence. The pathetic portrayal of the deplorable circumstances which destroyed appellant's home and happiness, and caused him to take the life of the wicked author of it all, can but elicit the profound sympathy of every man who loves virtue and appreciates conjugal fidelity and domestic peace. But, nevertheless, the law, in its wisdom, defines the taking of human life under the circumstances as detailed by appellant as murder; and, so long as it is thus written, courts and jurors must obey its plain mandate.

Affirmed.